**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

AMBER FERGUSON,

      Plaintiff,                        CASE NO.:

vs.

BREVARD COUNTY SHERIFF'S OFFICE,
a municipal agency within the State of Florida,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Amber Ferguson ("Ferguson"), by and through her counsel, hereby files this Complaint and Demand for Jury Trial against Defendant, Brevard County Sheriff's Office ("BCSO"), and alleges as follows:

## NATURE OF ACTION

1.　　This action addresses claims of discrimination based on gender, pregnancy and disability, and claims of retaliation asserted by Ferguson against BCSO pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* (hereafter "Title VII"), as amended by the Pregnancy Discrimination Act of 1978 (hereafter "PDA") and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended by the ADA Amendments Act of 2008 (hereafter "ADAAA").

## JURISDICTION AND VENUE

2.　　The instant suit is a claim for damages in excess of $75,000.00.

3.　　Jurisdiction in this Court is proper as Ferguson is bringing this action pursuant to Title VII, the PDA and the ADAAA, thereby raising a federal question over which this Court possesses original jurisdiction.

4.      Venue is proper in the U.S. District Court in the Middle District of Florida, because all of the unlawful employment practices in dispute occurred in Brevard County, Florida, which is within the Middle District.

## PARTIES

5.      Ferguson is a female and a former employee of BCSO. At all times material hereto, is and was a resident of Brevard County, Florida.

6.      At all times material hereto, BCSO was a municipal agency doing business in Brevard County, Florida.

7.      At all times material hereto, BCSO was an "employer" as defined by Title VII, the PDA and the ADAAA, because it engaged in an industry affecting commerce and has fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks in the year the unlawful employment practices took place and the preceding calendar year.

8.      At all times material hereto, BCSO was the employer of Ferguson.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

9.      Ferguson exhausted her administrative remedies under the Title VII, the PDA and the ADAAA by dual-filing Charges of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) and the Florida Commission on Human Relations (FCHR) within three hundred sixty-five (365) days of the discriminatory conduct alleged in this action.

10.     On September 10, 2018, the EEOC issued a cause determination finding that there was reason to believe that BCSO discriminated against Ferguson because of her pregnancy.

11.     On April 24, 2019, the United States Department of Justice issued a notice of right to sue on Ferguson's Title VII, PDA and ADAAA claims.

12.     Ferguson has satisfied any and all administrative requirements precedent to the filing of this action and is permitted to proceed to court pursuant to Title VII, the PDA and the ADAAA.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

13.     Ferguson began working for BCSO on approximately March 8, 2005.

14.     Ferguson's last position held with BCSO was as a Certified Corrections Deputy.

15.     On or about March 6, 2013, Ferguson notified BCSO that she was pregnant when she presented a doctor's note to her immediate supervisor, Sergeant Brian Seeley.

16.     The doctor's note stated that Ferguson was a patient for pregnancy who had an estimated due date of October 30, 2013, and that as of March 6, 2013, she had no medical restrictions.

17.     BCSO's standard practice was to assign pregnant corrections deputies without any medical restrictions to a modified duty position in a control room, provided that they had completed field training for the control room position.

18.     Other pregnant corrections deputies at BCSO who were placed in a control room position and allowed to wear civilian maternity clothing for the duration of their pregnancy included Shannon Popielarczyk, Sherri Stewart-Sommers, Yolanda Rivera, Carissa LaRoche, Megan Cronan and Heather Underhill.

19.     During Ferguson's previous pregnancy in 2011, BCSO assigned her to a modified duty position in a control room for the duration of her pregnancy and allowed her to wear civilian maternity clothing.

20.     The control room is a certified deputy and civilian, corrections technician, duty position.

21.     Control room positions at BCSO do not require any inmate contact.

22.     On or about March 15, 2013, Ferguson informed Sergeant Darryl McCullough, who was responsible for scheduling and posting, that she was pregnant.

23.     On or about March 15, 2013, Sergeant McCullough assigned Ferguson to a modified duty position within a control room.

24.     Ferguson worked in the control room in a modified duty position from March 15, 2013, through May 11, 2013.

25.     In the beginning of May 2013, Ferguson notified Sergeant Seeley that she was uncomfortable in her full duty uniform because it did not fit properly and requested that she be allowed to wear maternity clothes.

26.     BCSO does not have a policy regarding designated maternity wear for pregnant employees.

27.     BCSO required Ferguson to wear a full duty, Class A uniform and a utility belt with corrections issued accessories and equipment.

28.     On May 6, 2013, Sergeant Brian Seeley sent an e-mail to Lieutenant Ronald Tomblin and Sergeant Clifford Ferguson in response to Ferguson's inquiry into BCSO's policy regarding uniform requirements for pregnant employees.

29.     In his May 6, 2013, e-mail, Sergeant Seeley stated, "I'm kind of assuming appropriate civilian clothes with ID badge worn and working in control rooms once we get to that point."

30.     On or about May 11, 2013, Ferguson was removed from her modified duty position in the control room and was informed by Lieutenant Ronald Tomblin that until she

provided medical documentation requesting "light duty" and stating restrictions that she was no longer going to be accommodated.

31.     From May 11, 2013, until May 20, 2013, Ferguson worked in the infirmary.

32.     On May 16, 2013, Ferguson sent an e-mail to Sergeant Seeley requesting clarification on the second doctor's note that administration was requesting and what it needed to specify.

33.     On May 17, 2013, Sergeant Seeley responded via e-mail to Ferguson and stated, "Like we discussed the other day, you'll need a [doctor's] note to officially be moved from full duty to light duty. The [doctor] will probably understand what he needs to specify but something along the line of 'due to patient['s] condition, inmate contact would pose a risk…no lifting…etc.' The note then goes to admin for light duty approval. Until you are officially light duty, we should be able to [gather] you a couple new uniforms by having [Lieutenant] sign a request. I would think you could hold onto your current ones for later. We can double check on what will be your maternity uniform next week."

34.     On May 20, 2013, Ferguson received a phone call from Sergeant Edward Ostrom who requested that she report to her shift supervisor, Lieutenant Tomblin, for a meeting that afternoon.

35.     Ferguson met with Lieutenant Tomblin and Sergeant Ostrom in Lieutenant Tomblin's office as requested.

36.     Ferguson informed Lieutenant Tomblin that she had been voicing her concerns that she was uncomfortable in her uniform for the last three weeks and that no one at BCSO had addressed her concerns.

37.     Specifically, Ferguson stated that the weight of the utility belt caused a lot of undue and immense pressure around her waist.

38.     At the time of the meeting on May 20, 2013, Ferguson was four (4) months pregnant.

39.     During the meeting, Lieutenant Tomblin told that Ferguson she could obtain a larger sized full duty uniform, but it still would have required Ferguson to wear a utility belt.

40.     BSCO allowed other pregnant corrections deputies to wear maternity clothes in lieu of a uniform.

41.     Lieutenant Tomblin could have granted Ferguson an exemption from wearing the prescribed full duty uniform.

42.     Lieutenant Tomblin denied Ferguson's request to wear maternity clothes in lieu of a uniform.

43.     During the meeting, Ferguson told Lieutenant Tomblin that she wanted to be placed back into the control room position that she had held previously.

44.     Ferguson further told Lieutenant Tomblin that she never requested to be removed from working on the floor and having direct inmate contact, she only wished to have limited inmate contact.

45.     Lieutenant Tomblin told Ferguson that until she produced a doctor's note stating that she needed to be placed on light duty, she was required to report to her full duty status position at the jail complex.

46.     Ferguson stated that she was not requesting light duty nor had her physician recommended light duty due to her pregnancy.

47.     Ferguson also stated that she didn't understand why she had to produce another doctor's note as she did not have any medical restrictions that would prevent her from performing her job duties.

48.     Other pregnant corrections deputies employed with BCSO were only required to submit a doctor's note stating that they were pregnant.

49.     Other pregnant corrections deputies employed with BCSO were never required to submit additional medical documentation to continue working in the control room.

50.     Lieutenant Tomblin further stated to Ferguson that until she brought in a doctor's note stating that she was fit for duty, she was relieved of her position effective immediately.

51.     From May 20, 2013, until May 24, 2013, Ferguson was Administratively Relieved from Duty Until Further Notice.

52.     On May 21, 2013, Lieutenant Tomblin contacted Ferguson to inform her that she should report to the Sheriff's Reception Center at the jail complex to meet with Major Gregory Robertson on May 24, 2013.

53.     On May 24, 2013, Ferguson went to the Sheriff's Reception Center, at the jail complex, and met with Sergeant Ostrom who told her that she needed to report for duty in the Reception Area.

54.     Later that morning on May 24, 2013, Ferguson met with Major Darrell Hibbs, Major Robertson and Chief Michael Lewis at the Jail Complex, in Major Hibbs' office.

55.     At the meeting on May 24, 2013, Chief Lewis offered Ferguson the opportunity to work in reception at the BCSO's Parkway complex relieving Corrections Deputy Sam Grimes who had been placed on light duty after breaking her hand.

56.     BCSO's Parkway complex is located in Titusville, Florida.

57.     Chief Lewis acknowledged that the Parkway Reception position would require Ferguson to commute further away than a position in the control room at the jail complex.

58.     Chief Lewis told Ferguson that the Parkway Reception position would require Ferguson be on an administrative schedule working eighty (80) hours per pay period, Monday through Friday, from 8:00 a.m. to 5:00 p.m. and she would be able to wear civilian attire.

59.     Ferguson's prior position in the control room at the jail complex required her to work an eighty-four (84) hour schedule that included four (4) hours of mandatory overtime.

60.     The Parkway Reception position would require Ferguson to work four (4) hours less per pay period, which would result in no overtime pay.

61.     Ferguson's reassignment to the Parkway Reception position violated Ferguson's rights pursuant to BCSO's collective bargaining agreement because of the forced schedule and pay change.

62.     Chief Lewis informed Ferguson that the Parkway Reception position was the only position that BCSO had available because it was the only open position that did not require any inmate contact.

63.     Ferguson again reiterated that she had never requested a position that had no inmate contact, but she had requested that her contact with inmates be limited.

64.     Chief Lewis asked Major Robertson whether there were any control room positions available, to which he responded that there were no available positions that were not already intended to be filled by other employees.

65.     BSCO kept a binder containing multiple shift rosters titled "Brevard County Jail Complex Supervisor's Daily Report" that had highlighted certified correction deputies, not on

light duty, assigned to work in control rooms because the shifts were short staffed. Both the shift supervisor and shift commander are required to sign off on these reports daily.

66.     Chief Lewis told Ferguson that the decision to put her in the Parkway Reception position was the best way to accommodate her pregnancy needs.

67.     Chief Lewis also stated that this was the best option for Ferguson because "we don't just create positions for people with 'light duty' needs."

68.     Chief Lewis told Ferguson that if any other positions opened up, he would contact her.

69.     Chief Lewis directed Ferguson to take an unmarked car and report to civilian Christy Moore at Parkway Reception to get acquainted with the position, then return to the jail complex for lunch and work the remaining twelve (12) hours of her shift.

70.     Ferguson told Chief Lewis that she had previously been instructed by Lieutenant Tomblin to not go downstairs at the jail complex, where the staff lunchroom was located.

71.     The staff luncheon was located in an area that would have subjected Ferguson to indirect inmate contact.

72.     In response, Chief Lewis told Ferguson, "well, we can get someone to escort you downstairs."

73.     After the meeting, while waiting inside Imogene Mullins' office for the car keys to the unmarked vehicle she would be taking, Ferguson noticed that the dry erase board had vacancies for the jail complex written on it.

74.     As of May 24, 2013, there were seven (7) corrections deputy positions, two (2) corrections technician positions and one (1) licensed mental health position available.

75.     After the meeting on May 24, 2013, Chief Lewis sent an e-mail advising BCSO personnel that Ferguson would be assigned to modified duty for an extended period of time, reporting to the main reception area of the Parkway Complex on Tuesday, May 28, 2013, and working an administrative schedule.

76.     That afternoon, upon returning to the jail complex, Ferguson was escorted downstairs to the staff lunchroom by Sergeant Gregory Davis.

77.     Prior to May 24, 2013, BCSO had never required Ferguson to be escorted to the lunchroom.

78.     BCSO did not require other pregnant corrections deputies to be escorted to the lunchroom or throughout the jail complex.

79.     On May 27, 2013, Ferguson contacted the Equal Opportunity Employment Commission (EEOC) to file a charge of discrimination against BCSO.

80.     On May 28, 2013, Ferguson reported to the Parkway Reception Center in Titusville per Chief Lewis's instruction.

81.     Upon her arrival, Ferguson was greeted by Chief Lewis, who stated to her, "I was just making sure you made it up here. We are glad to have you here, just make it your new home."

82.     Chief Lewis then stated, "I don't know what we are going to do after you have the baby; it's easier with two people up here…we like it as a light duty post. You should be thanking me that I didn't put you in records all they do is file a lot of papers."

83.     That afternoon, Tracy Jeffreys in Human Resources met with Ferguson and requested that she provide a doctor's note stating that she needed to be put on light duty.

84.     Ferguson informed Jeffreys that her physician had not placed her on light duty and that she did not need to be placed into a light duty position.

85.     Ferguson explained to Jeffreys that all she had requested was limited inmate contact and to return to the control room where every other pregnant corrections deputy had been placed in the past for the duration of their pregnancy.

86.     After leaving for a brief period of time, Jeffreys returned and then advised Ferguson that she would be meeting with Chief Lewis the following morning.

87.     On May 29, 2013, Ferguson met with Chief Lewis, Major Hibbs and Lisa Gills with Human Resources.

88.     Upon entering the meeting, Chief Lewis immediately stated to Ferguson, "Let me start off by saying I am so completely frustrated about all this. I've been hearing about this issue for a week. A week longer than I've wanted to and it's all going to end today. I don't understand what the problem is. You didn't want to be at the jail and now you're saying you're not light duty. What is going on, what's the problem?"

89.     Ferguson advised Chief Lewis that she never said she did not want to be at the jail complex.

90.     Ferguson repeatedly told Chief Lewis that her physician had not placed her on light duty and that she was capable of performing a full duty position.

91.     Ferguson again reiterated that she had only informed Chief Lewis that she was uncomfortable with direct inmate contact.

92.     Chief Lewis responded, "Well I tried accommodating your needs but your husband didn't want to move shifts and said that if we moved him, we would be hearing from his

attorney. I don't know what you want from us. I've tried working with you and keep getting hit with an olive branch every time I turn around."

93.     Ferguson again reiterated that she only wanted to be treated like every other pregnant corrections deputy at BCSO, who were all placed in a control room position for the duration of their pregnancy.

94.     Chief Lewis replied, "Well, I am not going to use taxpayer dollars for your salary or just create a position, like putting you in a control room, when there are light duty positions all over the department I could use you in. I know you are upset because you have to drive an extra ten minutes from Palm Bay but this is what we have for you. Or, you can return to the jail full duty. When I say full duty, I mean any pod, full capacity and you will be held accountable. Is that what you want?"

95.     Ferguson replied that she just wanted to be treated like every other pregnant corrections deputy at BCSO.

96.     Ferguson also reminded Chief Lewis of one other pregnant corrections deputy at BCSO who had recently given birth and who had been placed in the control room from October 2012, through April 2013, for the duration of her pregnancy.

97.     Chief Lewis told Ferguson to return home, put on her uniform and return to work.

98.     Ferguson complied and returned to the Jail Complex to work in the infirmary.

99.     That afternoon, Ferguson informed Sergeant McCullough that she needed to go to the emergency room because she was bleeding.

100.    After her visit to the emergency room, Ferguson was diagnosed with a threatened abortion and was placed on bed rest for four (4) days.

101.    On or about May 30, 2013, Tracy Jeffreys and other members of BCSO administration informed employees that there were no longer light duty positions available at the jail complex. This was done in an attempt to justify why Ferguson was not allowed to remain working at the jail complex even if she was assigned to light duty. However, on September 16, 2013, Lieutenant Sharon Cummings sent an e-mail to Lieutenant George Fayson and other BCSO employees stating that "Civilian Technician McKeehan has been placed on light duty, but will remain here at the jail."

102.    On May 31, 2013, Ferguson submitted a second doctor's note indicating that she could return to full duty with no restrictions.

103.    From June 3, 2013, to June 7, 2013, Ferguson was assigned to work full duty in the infirmary of the Medical Housing Unit.

104.    On Friday, June 7, 2013, Major Robertson met with Sergeant Mark Shoar, Sergeant Gregory Davis, Sergeant Edward Ostrom, Sergeant Darryl McCullough, Sergeant Brian Seeley and Lieutenant Sharon Cummings.

105.    During the meeting, Major Robertson informed the Sergeants and Lieutenant that Ferguson was no longer going to be accommodated nor would she receive special treatment.

106.    Major Robertson stated that Ferguson was not going to be allowed to work in the control room.

107.    Major Robertson further stated that Ferguson was to be assigned to working full duty in the pods on the floor with direct inmate contact and that she would no longer be assigned to work in the Infirmary of the Medical Housing Unit.

108.   On June 8, 2013, Ferguson was reassigned from the Infirmary to Lower Dorm Two at the Female Facility at the jail complex, a Maximum Security Housing Unit per Lieutenant Kelly Haman.

109.   On June 12, 2013, Ferguson was reassigned to Lower Dorm One at the Female Facility at the jail complex where she continued to work until July 2, 2013.

110.   After returning home from work on July 2, 2013, Ferguson's water broke, at 20 weeks gestation, and she was rushed to the emergency room.

111.   From July 2, 2013, to August 24, 2013, Ferguson was kept on strict, hospital confined, bed rest.

112.   On July 8, 2013, Ferguson was placed on leave pursuant to the Family and Medical Leave Act (FMLA).

113.   Ferguson's twelve (12) weeks of FMLA leave was set to expire on September 30, 2013.

114.   A number of BCSO employees graciously donated their leave time to Ferguson to utilize during this time.

115.   On July 22, 2013, in response to the numerous employees who offered to donate their leave time to Ferguson, an e-mail was circulated by Tracy Jeffreys to BCSO Secretaries and Accounting Clerk Gloria Brinson stating that Ferguson "had received the maximum allowed hours for donations. Please do not accept any more donations."

116.   On August 16, 2013, Ferguson sent a memorandum via chain of command to Sheriff Ivey requesting an extension of her leave until November 28, 2013, because she was still on strict hospital bed rest and not expected to give birth until October 3, 2013, via cesarean section.

117.    Sheriff Ivey granted Ferguson a thirty (30) day extension that extended her leave until October 30, 2013.

118.    Ferguson delivered her son prematurely at twenty-eight (28) weeks on August 24, 2013.  Ferguson went into spontaneous premature labor and her son was a breech birth. Ferguson's son came out blue and pale with an APGAR score of 1. As a result, her son was placed in the Neonatal Intensive Care Unit at Winnie Palmer Hospital.

119.    On October 7, 2013, Ferguson sent a second memorandum via chain of command to Sheriff Ivey, again, requesting an additional leave extension of thirty (30) days to care for her extremely premature and medically fragile son.

120.    Sheriff Ivey granted Ferguson another thirty (30) day extension that extended her leave until November 30, 2013.

121.    On November 19, 2013, Ferguson sent a third memorandum via chain of command to Sheriff Ivey requesting an additional thirty (30) day extension, to use remainder of donated leave, and to be considered for a leave of absence without pay status for a year according to BCSO's policy and procedure.

122.    On November 21, 2013, Ferguson received a phone call from Tracy Jeffreys, Human Resources, indicating that Chief Lewis and Director Stephen Salvo were requiring a detailed explanation of Ferguson's son's medical requirements after discharge from the hospital.

123.    On November 22, 2013, Ferguson provided Director of Human Resources, Stephen Salvo, with a doctor's note from Winnie Palmer Hospital detailing her son's discharge needs and care.

124.    On December 2, 2013, Ferguson received a conference phone call between Tracy Jeffrey and Director Salvo.

125.     Director Salvo informed Ferguson that both her request for an additional thirty (30) day extension of her leave and her request for leave without pay for a year were denied.

126.     Director Salvo said that since Ferguson had been out since July 2, 2013, that BCSO was no longer going to hold her position and that she needed to return to work regardless of her son's medical status.

127.     Director Salvo informed Ferguson that she needed to return to work on Friday, December 6, 2013.

128.     On December 4, 2013, after leaving the hospital, while Ferguson was getting in her car at the Ronald McDonald House parking lot, she was met by Tracy Jefferys and Corporal Leon Maddox.

129.     Corporal Leon Maddox served Ferguson with a letter confirming the telephone conversation between her and Director Salvo on December 2, 2013.

130.     During the conversation with Corporal Maddox and Jefferys, Ferguson was urged several times to resign her position in lieu of being fired as it would be easier to get re-hired at later date.

131.     On December 6, 2013, BCSO sent Ferguson written notice of her termination via certified mail prior to her medically fragile son being released from the hospital.

## COUNT I: TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED
### (GENDER (PREGNANCY) DISCRIMINATION)

132.     Ferguson hereby repeats and realleges the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

133.     Ferguson is a female and was, at all times relevant to this action, pregnant, placing her within a protected category (pregnancy) under Title VII and the PDA.

134.    Ferguson was, at all times material hereto, qualified to perform and did perform her job duties with BCSO.

135.    Ferguson was subjected to disparate treatment and adverse employment actions based on her pregnancy when, inter alia, BCSO failed to provide accommodations and treated her less favorably than it had treated other pregnant corrections deputies by refusing to allow Ferguson to continue to work a modified duty position in a control room, refusing to allow Ferguson to wear maternity clothing in lieu of a full uniform with a utility belt, requiring that she submit a doctor's note requesting "light duty" even though her physician had not placed any medical restrictions on her, and ultimately terminating her employment.

136.    BCSO's unlawful motivation (pregnancy discrimination) was revealed, in part, because no other pregnant Correction Deputies were required to produce a doctor's note in order to work in the Control Room, all other pregnant Correction Deputies worked in the Control Room until they gave birth, and all other pregnant Correction Deputies were allowed to wear maternity clothing in lieu of a full uniform with a utility belt until they gave birth.

137.    The unlawful employment practices complained of and the actions of BCSO and/or its agents were willful, wanton, intentional, and committed with malice or with reckless indifference to Ferguson's protected rights, entitling her to an award of punitive damages.

138.    The actions of BCSO make reinstatement ineffective as a make-whole remedy, entitling Ferguson to front pay in lieu of reinstatement.

139.    As a direct and proximate result of BCSO's discriminatory actions, Ferguson has incurred, and will continue to incur, economic damages in the form of lost wages and benefits, and other compensable damages in the form of emotional pain and suffering, inconvenience, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

140.     Ferguson has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Ferguson demands judgment against BCSO for:

    a.      Back pay;

    b.      Front pay in lieu of reinstatement;

    c.      Compensatory damages;

    d.      Punitive damages;

    e.      Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 2000e-5(k); and

    f.      Such other relief as this Court deems just and proper.

## COUNT II: TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (RETALIATION)

141.     Ferguson hereby repeats and realleges the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

142.     Ferguson engaged in protected activity when she objected to the unlawful gender (pregnancy) discrimination to which she was being subjected.

143.     BCSO violated Title VII and the PDA by retaliating against Ferguson for objecting to the unlawful gender (pregnancy) discrimination to which she was being subjected, with such practices constituting unlawful employment practices.

144.     Ferguson was subjected to adverse employment actions based on her gender (pregnancy) when BCSO treated her less favorably than it had treated other pregnant corrections deputies by refusing to allow Ferguson to continue to work a modified duty position in a control room, refusing to allow Ferguson to wear maternity clothing in lieu of a full uniform with a

utility belt, requiring that she submit a doctor's note requesting "light duty" even though her physician had not placed any medical restrictions on her, and ultimately terminating her employment.

145.    The adverse employment actions suffered by Ferguson was causally related to, and in retaliation for, Ferguson complaining about, and objecting in good faith to, unlawful gender (pregnancy) discrimination as prohibited by Title VII and the PDA.

146.    The unlawful employment practices complained of and the actions of BCSO and/or its agents were willful, wanton, intentional, and committed with malice or with reckless indifference to Ferguson's protected rights, entitling her to an award of punitive damages.

147.    The actions of BCSO make reinstatement ineffective as a make-whole remedy, entitling Ferguson to front pay in lieu of reinstatement.

148.    As a direct, proximate, and foreseeable result of BCSO's retaliatory actions, Ferguson has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

149.    Ferguson has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## **DEMAND FOR RELIEF**

WHEREFORE, Ferguson demands judgment against BCSO for:

   a.  Back pay;

   b.  Front pay;

   c.  Compensatory damages;

d.    Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 2000e-
5(k); and

e.    Such other relief as this Court deems just and proper.

**COUNT III: THE AMERICANS WITH DISABILITIES ACT, AS AMENDED BY THE
ADA AMENDMENTS ACT OF 2008
(DISABILITY (ACTUAL OR PERCEIVED) DISCRIMINATION)**

150.    Ferguson hereby repeats and realleges the allegations contained in paragraphs 1
through 131 as if fully set forth herein.

151.    Ferguson is a qualified individual with a disability and/or handicap as defined by
the ADAAA as she had physical and/or mental impairments that substantially limit one or more
major life activities and bodily functions. Specifically, Ferguson experienced a temporary change
to her body due to her progressing pregnancy and related complications, making it extremely
difficult for her to wear a full duty Class A uniform with utility belt and corrections issued
accessories and equipment without causing her significant discomfort and pain.

152.    At all times relevant to this claim, Ferguson, as a Certified Corrections Deputy,
was a qualified individual with the appropriate training, experience, ability and skill to perform
the essential functions of her position with or without reasonable accommodations.

153.    BCSO mandated that Ferguson wear a full duty Class A uniform with utility belt
and corrections issued accessories and equipment notwithstanding her disability. In doing so,
BCSO utilized standards or criteria that have the effect of discrimination on the basis of
disability in violation of 42 U.S.C. § 12111(a) and (b)(3).

154.    Furthermore, Ferguson experienced symptoms due to her complicated pregnancy,
which affected both her major life activities and major bodily functions, including experiencing

early labor, being medically confined to strict hospital bed rest for months, and going into spontaneous premature labor with her son coming out a breech birth with an APGAR score of 1.

155.    BSCO knew of Ferguson's disability and/or handicap.

156.    BCSO discriminated against Ferguson based on her disability and/or handicap by denying Ferguson's request to wear maternity clothing in lieu of a full duty Class A uniform with utility belt, denying Ferguson's request for extended medical leave to care for her son who was born prematurely and required significant medical treatment, refusing to allow Ferguson to utilize donated leave from other employees of BCSO, and ultimately terminating her employment while Ferguson was staying at the Ronald McDonald House.

157.    On December 6, 2013, BCSO abruptly terminated Ferguson's employment.

158.    BSCO's decision to terminate Ferguson was based on BCSO regarding or perceiving Ferguson as having an impairment that substantially limits one or more major life activities or bodily functions.

159.    BSCO violated the ADAAA when it terminated Ferguson's employment because she was regarded as or perceived as having a disability.

160.    The unlawful employment practices complained of and the actions of BCSO and/or its agents were willful, wanton, intentional, and committed with malice or with reckless indifference to Ferguson's protected rights, entitling her to an award of punitive damages.

161.    The actions of BCSO make reinstatement ineffective as a make-whole remedy, entitling Ferguson to front pay in lieu of reinstatement.

162.    As a direct and proximate result of BCSO's discriminatory actions, Ferguson has incurred, and will continue to incur, economic damages in the form of lost wages and benefits,

and other compensable damages in the form of emotional pain and suffering, inconvenience, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

163.    Ferguson has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Ferguson demands judgment against BCSO for:

a.    Back pay;

b.    Front pay in lieu of reinstatement;

c.    Compensatory damages;

d.    Punitive damages;

e.    Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

f.    Such other relief as this Court deems just and proper.

## COUNT IV: THE AMERICANS WITH DISABILITIES ACT, AS AMENDED BY THE ADA AMENDMENTS ACT OF 2008 (FAILURE TO ACCOMMODATE)

164.    Ferguson hereby repeats and realleges the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

165.    Ferguson is a qualified individual with a disability and/or handicap as defined by the ADAAA as she had physical and/or mental impairments that substantially limit one or more major life activities and bodily functions. Specifically, Ferguson experienced a temporary change to her body due to her progressing pregnancy and related complications, making it extremely difficult for her to wear a full duty Class A uniform with utility belt and corrections issued accessories and equipment without causing her significant discomfort and pain.

166.    At all times relevant to this claim, Ferguson, as a Certified Corrections Deputy, was a qualified individual with the appropriate training, experience, ability and skill to perform the essential functions of her position with or without reasonable accommodations.

167.    BCSO discriminated against Ferguson on the basis of her disability by refusing to provide the reasonable accommodations of continuing to allow Ferguson to work in the control room, continuing to allow Ferguson to wear maternity clothing in lieu of a full duty Class A uniform, denying Ferguson's request for extended medical leave to care for her son who was born prematurely and required significant medical treatment, refusing to allow Ferguson to utilize donated leave from other employees of BCSO, and ultimately terminating her employment in order to avoid further accommodation.

168.    The reasonable accommodations requested by Ferguson would have enabled her to perform the essential functions of her job without significant discomfort and pain and would have allowed her the necessary time to care for her medically fragile son after he was born prematurely.

169.    Ferguson had been allowed to work in the control room and wear maternity clothing in lieu of a full duty Class A uniform without requiring a doctor's note recommending "light duty" throughout the duration of her previous pregnancy in 2011 with no problems or issues. Thus, wearing a full duty Class A uniform is not an essential function of the job, and the accommodations requested did not present an undue hardship for BCSO. Rather than continuing these accommodations, BCSO refused to allow Ferguson to continue working in the control room, required her to continue to wear her full duty Class A uniform, and required that she submit a doctor's note requesting "light duty" even though her physician had not placed any medical restrictions on her.

170.     The actions of BCSO were willful, wanton, intentional and/or were performed with malice and/or with reckless indifference to Ferguson's protected rights under the FCRA, thereby entitling Ferguson to punitive damages.

171.     The actions of BCSO make reinstatement ineffective as a make-whole remedy, entitling Ferguson to front pay in lieu of reinstatement.

172.     As a direct and proximate result of BCSO's failure to provide reasonable accommodations, Ferguson has incurred, and will continue to incur, economic damages in the forms of lost wages and benefits, and other compensable damages in the forms of emotional pain and suffering, inconvenience, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

173.     Ferguson has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Ferguson demands judgment against BCSO for:

a.     Back pay;

b.     Front pay in lieu of reinstatement;

c.     Compensatory damages;

d.     Punitive damages;

e.     Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

f.     Such other relief as this Court deems just and proper.

**COUNT V: THE AMERICANS WITH DISABILITIES ACT, AS AMENDED BY THE
ADA AMENDMENTS ACT OF 2008
(RETALIATION)**

174.    Ferguson hereby repeats and realleges the allegations contained in paragraphs 1

through 131 as if fully set forth herein.

175.    Ferguson engaged in protected activity when she requested reasonable

accommodations and when she objected to the unlawful disability discrimination to which she

was being subjected.

176.    BCSO violated the ADAAA by retaliating against Ferguson for requesting

accommodations and for objecting to the unlawful disability discrimination to which she was

being subjected, with such practices constituting unlawful employment practices.

177.    BCSO took adverse employment actions against Ferguson as a result of her

protected activity by denying Ferguson's request for extended medical leave to care for her son

who was born prematurely and required significant medical treatment, refusing to allow

Ferguson to utilize donated leave from other employees of BCSO, and then ultimately

terminating her employment while Ferguson was staying at the Ronald McDonald House.

178.    The adverse employment actions suffered by Ferguson were causally related to,

and in retaliation for, Ferguson having engaged in the protected activities of seeking

accommodations, and of complaining about, and objecting in good faith to, unlawful disability

discrimination as prohibited by the ADAAA.

179.    The actions of BCSO were willful, wanton, intentional and/or were performed

with malice and/or with reckless indifference to Ferguson's protected rights under the ADAAA,

thereby entitling Ferguson to an award of punitive damages.

180.     The actions of BCSO make reinstatement ineffective as a make-whole remedy, entitling Ferguson to front pay in lieu of reinstatement.

181.     As a direct, proximate, and foreseeable result of BCSO's retaliatory actions, Ferguson has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

182.     Ferguson has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

### DEMAND FOR RELIEF

WHEREFORE, Ferguson demands judgment against BCSO for:

   a.     Back pay;

   b.     Front pay;

   c.     Compensatory damages;

   d.     Punitive damages;

   e.     Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

   f.     Such other relief as this Court deems just and proper.

### COUNT VI: THE AMERICANS WITH DISABILITIES ACT, AS AMENDED BY THE ADA AMENDMENTS ACT OF 2008
### (COERCION, INTERFERENCE, INTIMIDATION)

183.     Ferguson hereby repeats and realleges the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

184.     Section 12203(b) of the ADAAA states that "it shall be unlawful to coerce, intimidate, threaten or interfere in any way with an individual in the exercise or enjoyment of… any right granted or protected" by the ADAA.

185.    BCSO violated the ADAAA by interfering with Ferguson's exercise of rights guaranteed to her under the ADAAA, namely the right to reasonable accommodation of her disability in the workplace, and by subjecting Ferguson to intimidation, coercion, and threats that she would no longer be accommodated, and intimidating Ferguson to resign in an attempt to make her forego exercise of those rights, all of which interfered with her exercise and enjoyment of the right to reasonable accommodations and a workplace free from discrimination on the basis of her disability, and then terminating her employment.

186.    The actions of BCSO were willful, wanton, intentional and/or were performed with malice and/or with reckless indifference to Ferguson's protected rights under the ADAAA, thereby entitling Ferguson to an award of punitive damages.

187.    The actions of BCSO make reinstatement ineffective as a make-whole remedy, entitling Ferguson to front pay in lieu of reinstatement.

188.    As a direct, proximate, and foreseeable result of BCSO's interference with her exercise of rights under the AAA, Ferguson has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

189.    Ferguson has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## **DEMAND FOR RELIEF**

WHEREFORE, Ferguson demands judgment against BCSO for:

    a.    Back pay;

    b.    Front pay;

c.      Compensatory damages;

d.      Punitive damages;

e.      Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

f.      Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Amber Ferguson, hereby demands trial by jury on all issues so triable as a matter of right.

Date:   July 10, 2019                    Respectfully submitted,

                                                  s/ David H. Spalter
                                                  Jill S. Schwartz, Attorney at Law
Florida Bar No. 523021
David H. Spalter, Attorney at Law
Florida Bar No. 966347
JILL S. SCHWARTZ & ASSOCIATES, P.A.
655 West Morse Blvd., Ste. 212
Winter Park, Florida  32789
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
E-mail: jschwartz@schwartzlawfirm.net
E-mail: dspalter@schwartzlawfirm.net
Secondary E-mail: jtacktill@schwartzlawfirm.net
Secondary E-mail: docketing@schwartzlawfirm.net
Attorneys for Plaintiff